IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DONALD BRENNEMAN, | : | |
| | : | Case No. 1:07CV065 |
| Plaintiff, | : | |
| | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING |
| NVR, INC. | : | PLAINTIFF'S MOTION FOR A |
| | : | TEMPORARY RESTRAINING |
| Defendant. | : | ORDER |
| | : | |
| | : | |

This matter comes before the Court on Plaintiff's Motion for a Temporary Restraining Order. (Doc. 3.) Plaintiff Donald Brenneman filed both his Complaint (doc. 2) and the Motion for a Temporary Restraining Order (doc. 3) on January 26, 2007 in the Butler County Court of Common Pleas. Defendant NVR, Inc. subsequently removed the suit to this Court on January 31, 2007. The Court held a hearing on Plaintiff's Motion for a Temporary Restraining Order on February 7, 2007. For the reasons set forth below, the Court **GRANTS** Plaintiff's Motion.

## I.     BACKGROUND

Defendant NVR is a national company that operates homebuilding and mortgage lending services in twelve states throughout the Eastern United States. In the Southwest Ohio region and the surrounding areas, NVR's homebuilding segment does business as Ryan Homes. Ryan Homes develops and builds residential communities in and around Cincinnati, Dayton, and Northern Kentucky. NVR also operates mortgage lending segments consisting of NVR

1

Mortgage and NVR Settlement Services, whose focus is to fill the mortgage lending and title services needs of NVR's homebuyers.

Plaintiff worked for Ryan Homes for more than twenty years before being terminated on October 16, 2006. He began in 1985, taking an entry level position as a production technician. Over time, Plaintiff worked his way up through the company, and was promoted to General Manager in 2001. As General Manager, Plaintiff worked primarily in the Southwest Ohio region.[1] Defendant promoted Plaintiff again in 2004 to Vice President and Assistant Manager of the Cincinnati South region, which covered Hamilton and Clermont counties in Ohio and Boone, Kenton, and Campbell counties in Northern Kentucky.

In connection with his promotion to General Manager in 2001, Plaintiff became eligible to purchase stock options. To take advantage of this benefit, Plaintiff voluntarily entered into the NVR, Inc. 2000 Broadly Based Stock Option Plan Stock Option Agreement. (See Doc. 2, ex. A.) Plaintiff subsequently executed two other stock option agreements in 2004 and 2005 (hereinafter, the three agreements are collectively referred to as the "Stock Option Agreements"). All three agreements contain restrictive covenants pertaining to noncompetition and confidentiality. The covenants are substantially similar except that the noncompetition provision appearing in the 2005 agreement increased the term of the noncompetition agreement from one to two years. The restrictive covenants included in the 2001 and 2004 agreements state the following:

---

[1] According to Defendant, while Plaintiff held the position of General Manager he cultivated relationships with key real estate developers and suppliers in the region and participated in strategic planning regarding the acquisition of land from developers as well as the pricing of labor and materials. Plaintiff also acquired knowledge of Defendant's long-term development plans, marketing plans, and profit margins.

<u>Noncompetition and Confidentiality</u>. In consideration of the promises set forth in this Stock Option Agreement, the Optionee (i) agrees to maintain the confidentiality of any and all information concerning NVR and its affiliates, whether with respect to its business, operations, finances, employees or otherwise during the period of his or her employment and for three (3) years after the termination of such employment, and (ii) agrees that, upon termination of employment, and during the one (1) year period following termination, he or she will not compete with NVR or with any of its affiliates, directly or indirectly in any phase of the residential homebuilding business or mortgage financing business or settlement services business at any location within any Standard Metropolitan Statistical Area (as determined by the Census Bureau, Department of Commerce, United States Government) in which Optionee has had managerial responsibility for any office or affiliate of NVR within the two-year period prior to the Optionee's termination of employment and (iii) agrees that he or she will not hire or solicit for hiring, directly or indirectly, any person now or hereafter employed by NVR or any affiliate of NVR within the Standard Metropolitan Statistical Area(s) over which he or she holds managerial responsibilities for two (2) years after termination of employment and (iv) agrees that he or she will not utilize the services of or attempt to acquire real property, goods or services from any developer, supplier or subcontractor now or hereafter utilized by NVR or any affiliate of NVR for two (2) years after termination of employment or (v) agrees not to make or retain copies of any documents, forms, blueprints, designs, policies, memoranda or other written information developed by NVR or any affiliate of NVR now or hereafter produced and/or circulated by NVR and further agrees not to copy, transfer or otherwise retain any electronic data (including information stored on a hard drive or disk), software (including proprietary software), computer data bases or other non-print information produced, designed, owned copyrighted or utilized by NVR.

The Optionee acknowledges that the restrictions set forth in this Section 8 and elsewhere in this Agreement are reasonable and necessary to protect the business and interests of NVR and its affiliates and that it would be impossible to measure in money the damages that could or would accrue to NVR and its affiliates in the event that the Optionee fails to honor his or her obligations under this Section 8. Therefore, in addition to any other remedies NVR or its affiliates may have, it shall have the right to have the Optionee's obligations hereunder specifically performed by order of any court having jurisdiction, without the necessity of proving actual damage.

(Doc. 2, exs. A, B.)

Under the Stock Option Agreements, Plaintiff's stock options would not vest until December 31, 2006 at the earliest. On October 16, 2006, mere months before the first of

Plaintiff's stock options was to vest, Defendant terminated Plaintiff.[2] As a result, Plaintiff never had an opportunity to exercise the options.

Following his termination, Plaintiff obtained a Vice President position with Oberer Residential Construction, Ltd. ("Oberer"), which company does business as Gold Key Homes. Defendant claims that it is in direct competition with Oberer in Southwest Ohio. When Defendant learned of Plaintiff's employment with Oberer, Defendant sent a cease and desist letter to Oberer, advising Oberer of the noncompetition provision in the 2005 Stock Option Agreement and asking Oberer to terminate Plaintiff. Oberer responded that it did not compete with Defendant and challenged the enforceability of the agreement. The two companies entered into negotiations; however, the negotiations proved fruitless and Oberer ultimately terminated Plaintiff on January 11, 2007. Plaintiff subsequently filed the instant action, seeking a declaratory judgment and injunction to prevent Defendant from further threatening or seeking enforcement of the noncompetition provision.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes the Court to grant a temporary restraining order. When deciding whether to grant preliminary injunctive relief, the Court considers four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of preliminary injunctive relief would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunctive relief. See Leary v. Daeschner, 228 F.3d 729, 736 (6th Cir. 2000); see also Mason County Med. Ass'n v. Knebel, 563 F.2d 256, 261 (6th Cir.

---

[2] Aside from the effect of Plaintiff's termination on the Stock Option Agreements, the facts surrounding Plaintiff's termination are largely irrelevant to the instant action.

1977).

### III.  ANALYSIS

#### A.  Strong Likelihood of Success on the Merits

This case turns on the enforceability of the Stock Option Agreements.  Plaintiff claims that the agreements are invalid and unenforceable because: (1) the restrictive covenants within the agreements do not contain a valid geographic limitation; (2) the restrictive covenants are overbroad and would prevent Plaintiff from earning a living; and (3) the agreements are not supported by valid consideration.  The parties agree that interpretation and enforcement of the Stock Option Agreements is governed by Virginia law.

Under Virginia law, noncompetition agreements are disfavored "because covenants not to compete, by their nature, restrain competition, and accordingly curb the fundamental right of individuals to seek success in our free-enterprise society."  Lanmark Tech., Inc. v. Canales, 454 F. Supp. 2d 524, 528 (E.D. Va. 2006) (internal quotations omitted).  The Supreme Court of Virginia has articulated a three-prong test to evaluate the enforceability of such covenants, requiring the employer to show that the covenant is: (1) narrowly drawn to protect the employer's legitimate business interest; (2) not unduly burdensome on the employee's ability to earn a living; and (3) not against sound public policy.  Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc., 270 Va. 246, 249, 618 S.E.2d 340 (2005).  In analyzing the three factors, courts must consider the disputed restriction "in terms of function, geographic scope, and duration."  Simmons v. Miller, 261 Va. 561, 581, 544 S.E.2d 666 (2001).

Because Virginia law disfavors covenants not to compete, any ambiguities in the restrictive covenants in the Stock Option Agreements will be construed in favor of Plaintiff.  See

Omniplex World Servs. Corp., 270 Va. at 249, 618 S.E.2d at 342.  Moreover, "where a non-compete clause is ambiguous, that is, it is susceptible to two or more differing interpretations, one of which is functionally overbroad, and thus unenforceable, the clause fails even though it may be reasonable as applied to the specific circumstances presented."  Lanmark Tech., 454 F. Supp. 2d at 529.

    **1.    Geographic Scope of Agreement**

Applying the above principles, the Court finds that there exists a strong likelihood that the restrictive covenants at issue contain an ambiguous geographical limitation that is susceptible to two or more differing interpretations, one or more of which is overbroad.  All three Stock Option Agreements limit the scope of the noncompetition provisions to "any location within any Standard Metropolitan Statistical Area (as determined by the Census Bureau, Department of Commerce, United States Government) in which the Optionee has managerial responsibility for any office or affiliate of NVR within the two-year period prior to the Optionee's termination of employment."  The covenants reference no date or time period within which the parties are to look to determine the applicable Standard Metropolitan Statistical Area ("SMSA").

The Census Bureau ceased using that term "Standard Metropolitan Statistical Area" in 1983, nearly two decades prior to the date Plaintiff executed the first Stock Option Agreement.  At that time, the Cincinnati SMSA included Hamilton, Clermont, and Warren Counties in Ohio, Campbell, Kenton, and Boone Counties in Kentucky, and Dearborn County in Indiana.  Since that time, the Census Bureau has modified the standards for defining metropolitan areas at least twice, the first time in 1990 and the second in 2000.  Currently the Census Bureau refers to the metropolitan areas as Metropolitan Statistical Areas ("MSA") and defines the MSA covering the

Cincinnati region to include fifteen counties in the tri-state area. (See doc. 3, ex. G.)

As the disputed covenants contains no instruction as to which Census Bureau standard defines the geographical scope of the agreement, the covenants are ambiguous. The ambiguity is only further highlighted by the apparent inability of Defendant to define the geographical scope of the covenants. For example, Defendant suggests in its response to Plaintiff's motion that the covenants do not prevent Plaintiff from seeking work in the Dayton SMSA, which Defendant claims includes Montgomery, Greene, Miami, and Preble Counties in Ohio. However, according to Plaintiff, Defendant's actions directly contradict that assertion in that Defendant sought to enforce the covenants against Gold Key Homes, the company that Plaintiff secured employment with after Defendant terminated him, despite the fact that Gold Key Homes is a Dayton area builder.

Moreover, under both the 1983 and current definitions of statistical areas, the covenants are arguably unenforceable as overbroad because the delineated geographical area is broader than the territory in which Plaintiff actually had managerial duties. See Cantol, Inc. v. McDaniel, No. 2:06cv86, 2006 WL 1213992, at *4 (E.D. Va. April 28, 2006) (citing Simmons, 261 Va. at 580-82, 544 S.E.2d 666) ("[T]he Supreme Court of Virginia has never upheld a restrictive covenant, which was ancillary to an employer-employee relationship, when the restrictive covenant could be applied to a geographic area in which the employee performed no function for the employer.").

  2.     **Unenforceable as Overbroad**

Plaintiff next argues the restrictive covenants are overbroad because, aside from seeking to prohibit Plaintiff from working in geographic areas in which he had no managerial

responsibility, the agreements also purport to prevent Plaintiff from working in any position whatsoever with a competitor. Plaintiff further contends that the nonsolicitation provisions included in the covenants are so broad as to cover vendors and employees of entities in other states and therefore provide Plaintiff with no guidance as to what entities or individuals would fall within the scope of the agreement.

      The Court agrees that it appears likely that the restrictive covenants are overbroad under Virginia law. The noncompetition provision, for example, provides that Plaintiff may "not compete with NVR or any of its affiliates, directly or indirectly in any phase of the homebuilding business or mortgage financing business or settlement services business" within the area described above. Therefore, adding to the likelihood that the geographic limit of this provision is fatally ambiguous is the equally strong likelihood that the provision prevents Plaintiff from seeking employment in lines of work in which he was not engaged while working for Defendant. Specifically, Plaintiff does not appear to have had significant dealings with Defendant's mortgage financing or settlement services sectors. Instead, Plaintiff worked for Ryan Homes, the real estate development and homebuilding segment. With respect to employment with a direct competitor, as is alleged to be the concern in this case, the Supreme Court of Virginia has upheld noncompetition agreements that "restrict the former employee's performance of functions for his new employer only to the extent that the proscribed functions are the same functions as were performed for the former employer." Cantol, 2006 WL 1213992 at *4. Indeed, courts applying Virginia law have refused to enforce noncompetition agreements that seek to prohibit employees from engaging in work that the employees did not perform for their former employers. See id. at *5 (finding that the plaintiff employer "overstepped the permissible limits

of covenants not to compete by defining competition to encompass more than the functions that [the defendant employee] performed for" the plaintiff); see also Richardson v. Paxton Co., 203 Va. 790, 795, 127 S.E.2d 113, 117 (1962) (holding that a covenant not to compete that restricted a former employee, who sold specific supplies and services, from working for any employer involved with any kind of supplies, equipment, or services in the same industry overbroad because the covenant encompassed business for which employer did not compete).

The Court additionally finds that the overbreadth of the restrictive covenants will likely prevent Plaintiff from finding any meaningful employment within his field of experience and therefore will unduly burden Plaintiff's ability to earn a living.

### 3. Lack of Consideration

Finally Plaintiff argues that it is substantially likely that the Stock Option Agreements are not supported by valid consideration, and are therefore unenforceable. Plaintiff's promotions did not appear to be conditioned on his execution of the Stock Option Agreements and concomitant agreement to the noncompetition provisions. Accordingly, the only consideration Defendant paid in exchange for Plaintiff's agreement to be bound by the noncompetition provision was a series of unvested stock options.

Defendant terminated Plaintiff before the first of his stock options was to vest. Plaintiff claims that as a result of Defendant's decision to terminate him, he received no benefit of any bargain under the Stock Option Agreements, rendering the agreements invalid for lack of consideration. It is somewhat less clear at this point whether, under Virginia law, the agreements fail for lack of consideration. However, the Court finds it to be a definite possibility, and in any case, the Court need not decide this matter at the present because Plaintiff has already made a

strong showing that the disputed restrictive covenants are invalid and unenforceable due to their ambiguity and overbreadth. Consequently, Plaintiff has demonstrated a substantial likelihood of success on the merits of his claims.

**B.    Irreparable Injury**

Because Plaintiff has demonstrated a substantial likelihood that the Stock Option Agreements are unenforceable, the Court must next determine whether Plaintiff will suffer irreparable injury if the temporary restraining order does not issue. Plaintiff claims that as a result of Defendant's efforts to enforce the agreement he has already suffered and continues to suffer injury to his reputation. Additionally, Plaintiff claims that because of Defendant's active opposition to his attempts to find further employment in the homebuilding industry, he has lost and will continue to lose employment opportunities that likely will not become available to him. In essence, Plaintiff argues that he has a short window of time to regain his stature within the industry. If Defendant is not enjoined from threatening or attempting to enforce the ambiguous and overbroad restrictive covenants in the Stock Option Agreements, Plaintiff may be forced out of the industry all together. Such injury would indeed be irreparable. Thus, this factor of the inquiry weighs in favor of granting Plaintiff's Motion for a Temporary Restraining Order.

**C.    Substantial Harm to Others**

The parties do not dispute this prong, and indeed, the Court finds that no substantial harm to others will result from an order temporarily restraining Defendant from threatening or seeking enforcement of the Stock Option Agreements.

**D.    Public Interest**

Like the question of whether a temporary restraining order will result in substantial harm

to others, the parties do not substantially dispute the question of whether such an order would be in the public interest. Plaintiff stated at the February 7, 2007 hearing that a restraining order would serve the strong public interest in freedom of contract. More specifically, it would serve future employers' interest in remaining free to chose whom to hire and how to conduct business. The Court finds that, given the strong likelihood that Plaintiff will succeed on the merits, this factor also weighs in favor of granting Plaintiff's motion.

V.   **CONCLUSION**

Plaintiff has demonstrated a strong likelihood of success on the merits regarding the alleged invalidity and unenforceability of the Stock Option Agreements, and the other factors to consider in granting a temporary restraining order weigh in Plaintiffs' favor. Accordingly, this Court **GRANTS** Plaintiff's Motion for a Temporary Restraining Order. (Doc. 3.) The Court hereby **ENJOINS** Defendant NVR, Inc. from threatening or seeking to enforce the restrictive covenants within the Stock Option Agreements dated December 1, 2001, January 1, 2004, and May 26, 2005 between Plaintiff and Defendant, pending the Court's decision on a preliminary injunction in this case.

IT IS SO ORDERED.

                                                  ___s/Susan J. Dlott_____
                                                  Susan J. Dlott
                                                  United States District Judge